UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JENNIFER BENTSON and RODNEY BENTSON, <br><br> Plaintiffs, <br><br> v. <br><br> WEST SUBURBAN BANCORP, INC. d/b/a WEST SUBURBAN BANK <br><br> Defendant. | Case No. 21-CV-5390 <br><br> Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Rodney and Jennifer Bentson, who are married, sued their former employer, West Suburban Bank ("WSB") after WSB allegedly discriminated against them based on Jennifer's disability. They assert claims under the Americans with Disabilities Act ("ADA"), Illinois Human Rights Act ("IHRA") and for intentional infliction of emotional distress ("IIED"). [1-1]. Defendant WSB now moves for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). [20]. For the reasons explained below, the Court grants in part, and denies in part, Defendant's motion [20].

**I.  Facts**

The Court draws all facts, which it takes as true for purposes of this motion, from Plaintiffs' Complaint, [1-1]. Defendant West Suburban Bancorp, Inc., doing business as WSB, is an Illinois corporation that provides banking services to DuPage, Kane, Kendall, and Will Counties. *Id.* ¶ 8. Plaintiff Jennifer Bentson (hereinafter

1

"Jennifer") began working at Defendant's Oswego West branch on January 23, 2006, as a Manager Trainee. *Id.* ¶¶ 12, 35. Plaintiff Rodney Bentson (hereinafter "Rodney"), Jennifer's husband, began working at Defendant's Lake Street Aurora branch on March 11, 2002, as a Collections Specialist. *Id.* ¶¶ 7, 23. Throughout their employment, Defendant gave Plaintiffs only positive performance reviews, provided them both with annual salary increases, and promoted Jennifer four times. *Id.* ¶¶ 13–18, 24.

On June 30, 2018, Jennifer was diagnosed with Multiple Sclerosis ("MS") and now "relies primarily on a wheelchair for mobility." *Id.* ¶¶ 19–20. The cost of treating and managing Jennifer's MS has exceeded $1,000,000 since the onset of the MS symptoms. *Id.* ¶ 22. Plaintiffs allege that the expense of Defendant's health insurance premium "significantly increased" as a "direct result" of Jennifer's medical expenses. *Id.*

On October 9, 2020, Rodney's manager, Kevin Bussey, informed Rodney that Defendant had decided to reduce Rodney's full-time position to twenty hours per week, accompanied by a salary decrease of more than $27,000 and loss of health insurance eligibility, among other benefits. *Id.* ¶¶ 26–27. On October 12, 2020, Rodney sent Bussey an email, protesting the decision and explaining, among other concerns, that there existed enough work for him to do to justify more hours and that he needed to maintain health insurance eligibility because a setback in Jennifer's MS could leave Rodney and Jennifer without the health insurance needed to treat Jennifer. *Id.* ¶¶ 28–29. Rodney offered to take a pay cut if Defendant would give him

2

enough hours to maintain health insurance. *Id.* ¶ 32. Bussey forwarded the email to Defendant's Senior Vice President and Director of Retail Branch Banking, Matthew Acker, asking Defendant to reconsider its decision given the significant scope and volume of Rodney's duties and his long-time service to Defendant. *Id.* ¶¶ 32–33. Acker responded that he would discuss "some of the items" with Debbie Ross, Defendant's then-Vice President and Director of Human Resources. *Id.* ¶¶ 30, 34. Nonetheless, on October 26, 2020, Defendant permanently reduced Rodney's position to twenty hours per week, making him ineligible for health insurance benefits. *Id.* ¶ 42. Acker also wrote to Bussey on November 11, 2020, via email, confirming that he saw "no need" to convert Rodney's position back to full-time. *Id.*

During this same time, Defendant also announced that it planned to close the Oswego West branch that Jennifer managed, effective January 26, 2021. *Id.* ¶ 35. In an email to all of Defendant's employees, Acker attributed the closure to difficulties negotiating a new lease with the building's management company. *Id.* On October 20, 2020, Ross emailed Jennifer that Defendant had chosen to eliminate her position based on the branch's closure and the "current and forecasted business needs" which required a reduction in staff. *Id.* ¶ 37. Ross invited Jennifer to apply internally to "any open job position" for which she was qualified but, if she did not find a replacement position, her employment with Defendant would terminate on January 30, 2021. *Id.* ¶ 38.

Three other employees at the Oswego West branch received similar notifications. *Id.* ¶¶ 39–40. The other three employees do not have any known

3

disabilities. *Id.* ¶ 38. Defendant hired two of them to fill open posted positions and Defendant's management hired the third for an unposted position without requiring the employee to submit an internal application. *Id.* Jennifer alleges that no open positions matched her qualifications, and so Defendant terminated her on January 30, 2021. *Id.* ¶¶ 44–46. On February 3, 2021, however, WSB promoted the Branch Manager of the Lake Street Aurora branch to another position. *Id.* ¶ 47. Although Jennifer was "exceptionally qualified" for this position, Acker and Defendant's management never informed her of the position despite knowing about its availability prior to Jennifer's termination on January 30, 2021. *Id.* ¶¶ 48–49.

Because WSB terminated Jennifer (and given Rodney's ineligibility for benefits due to his part-time status), Rodney had to end his eighteen-year career with Defendant on February 16, 2021, to take a full-time job elsewhere with a lower hourly rate and higher health insurance premiums. *Id.* ¶ 54. Finally, in July 2021, Defendant announced a merger with Old Second Bancorp, Inc. *Id.* ¶ 58. Plaintiffs contend that Defendant reduced Rodney's hours and terminated Jennifer's position in anticipation of this merger so that it no longer had to cover the health insurance premiums for Rodney and Jennifer, which had become increasingly expensive because of Jennifer's disability. *Id.* ¶ 53.

Jennifer and Rodney sued Defendant in state court, with Jennifer asserting claims for disability discrimination in violation of the IHRA (Count I) and ADA (Count II) and Rodney asserting claims for discrimination by association in violation of the ADA (Count IV). [1-1]. Both also asserted IIED claims against Defendant.

4

(Counts III, V). *Id.* Defendant removed the action to this Court, [1], and then answered the complaint, [8]. Now, Defendant moves for partial judgment on the pleadings as to Plaintiffs': (1) IIED claims; (2) constructive discharge theory for Rodney's ADA claim; and (3) request for punitive damages under the IHRA. [20].

## II.  Legal Standard

After the "pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Courts evaluate a Rule 12(c) motion using the same standard applicable to a Rule 12(b)(6) motion to dismiss. *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014). Specifically, a court accepts as true all well-pled allegations and draws all reasonable inferences in plaintiff's favor to determine whether the complaint contains sufficient "factual content that allows the Court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1937 (2009). A court will only grant a 12(c) motion if "the plaintiff cannot prove any facts that would support his claim for relief." *Midwest Gas Servs., Inc. v. Ind. Gas Co., Inc.*, 317 F.3d 703, 709 (7th Cir. 2003) (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d. 449, 452 (7th Cir. 1998)).

## III.  Analysis

### A.  Whether the IHRA Preempts Plaintiffs' Intentional Infliction of Emotional Distress Claims

First, Defendant argues that Plaintiffs' IIED claims are preempted by the IHRA. [21]; [25]. Defendant also argues that, in the alternative, the Complaint fails

to state a valid IIED claim because it does not allege facts to plausibly establish either: (1) "extreme" or "outrageous" conduct; or (2) intent. *Id.* As set out below, the Court agrees that the IHRA preempts Plaintiffs' IIED claims as alleged.

The IHRA prohibits employment discrimination based upon a person's disability. *See* 775 ILCS 5/101. Pursuant to the IHRA, the Illinois Human Rights Commission also exercises "exclusive jurisdiction over civil rights violations." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 602 (7th Cir. 2006); *see also* 775 ILCS 5/8-111(D) ("Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this act). Thus, the IHRA preempts any state law claim if it remains "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Naeem*, 444 F.3d at 602 (quoting *Maksimovic v. Tsogalis*, 687 N.E.2d 21 (Ill. 1997)). Thus, although the IHRA does not categorically preempt IIED claims, the alleged conduct to support the IIED claim must "be actionable even aside from its character as a civil rights violation." *Krocka v. City of Chi.*, 203 F.3d 507, 516 (7th Cir. 2000). In other words, to avoid preemption, Plaintiffs' allegations must establish "the elements of intentional infliction of emotional distress independent of legal duties furnished by the IHRA." *Naeem*, 444 F.3d at 604.

Therefore, the Court considers whether the Complaint alleges the elements of an IIED claim independent of Defendant's alleged violations of legal duties under the IHRA. To state an IIED claim under Illinois law, Plaintiffs must establish that: (1) the defendant's conduct was "extreme and outrageous"; (2) the defendant intended

6

for its conduct to inflict "severe emotional distress," or was aware of the high likelihood that severe emotional distress will result from defendant's conduct; and (3) the conduct in fact caused "severe emotional distress." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746 (7th Cir. 2008). The requirement for "extreme and outrageous" conduct remains particularly demanding. A plaintiff must allege conduct "so severe that a reasonable person could not be expected to endure it" and it must "go beyond all possible bounds of decency." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993). Illinois courts remain particularly hesitant to find intentional infliction of emotional distress in the workplace because "if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.,* 742 N.E.2d 858, 867 (Ill. App. Ct. 2000).

Plaintiffs insist that the IHRA does not preempt their IIED claims because, even putting aside Defendant's allegedly discriminatory motivations, Defendant engaged in a "pattern of egregious conduct" against them "intending to deprive and actually depriving Plaintiffs from employment, compensation and health insurance benefits." [24] at 6. They point to the Complaint's allegations regarding the health insurance premiums Defendant faced to insure Jennifer; how Defendant eliminated Rodney's full-time job to avoid giving him benefits; and how Defendant eliminated Jennifer's position without telling her about or considering her for another position for which she "was exceptionally qualified." *Id*. at 7. Overall, they argue that

Defendant's actions constitute "extreme and outrageous" conduct because Defendant's actions took away their health insurance, damaged their careers, and left them in "extreme emotional, mental, physical and financial distress." [1-1] ¶¶ 103–04, 135–36.

The Court disagrees. While Jennifer and Rodney may have found their alleged experiences distressing, they allege nothing extreme or outrageous about Defendant's conduct beyond the alleged and otherwise actionable discrimination. In fact, contrary to Plaintiff's insistence, the Complaint's own allegations confirm that Defendant's alleged discriminatory motives form the essential basis of their IIED claims. For example, they allege that Defendant's decision "to terminate Jennifer's employment after 15 years of employment because of Multiple Sclerosis ('MS') and the expense of providing health insurance due to her MS, were extreme and outrageous." [1-1] ¶ 101. Similarly, they allege that Defendant's actions "in reducing Rodney's position to part time, failing to hire, transfer and/or accommodate his wife, Jennifer for an open position" and "terminating Jennifer's employment—all due to Jennifer's Multiple Sclerosis ('MS') and the expense of providing health insurance to Rodney and Jennifer due to Jennifer's MS—were intentional, extreme and outrageous." *Id.* ¶ 102.

Defendant may have had a legal duty, pursuant to the IHRA, not to take the actions it took. Putting those legal duties aside, however, Plaintiffs do not point to anything that otherwise limited Defendant's ability to terminate Jennifer or reduce Rodney's hours, nor do they point to anything that required Defendant to offer Jennifer another position rather than terminate her. Merely terminating someone

8

or reducing their hours, without more, does not plausibly constitute extreme or outrageous conduct; otherwise, an employer could never terminate someone or reduce someone's hours without facing an IIED claim. *See, e.g., Graham,* 742 N.E.2d at 867 (holding that "discipline, personality conflicts, job transfers or even terminations" cannot suffice to support an IIED claim or "nearly every employee would have a cause of action."); *Lewis,* 523 F.3d at 747 ("We cannot subject employers to intentional infliction of emotional distress claims each time they decide to discharge an employee—even an employee with severe emotional problems—unless their conduct truly is egregious."); *Harriston,* 992 F.2d at 703 (agreeing that an employee failed to allege a viable IIED claim against her employer for allegedly taking away her management position and a highly profitable account, denying her a promotion, and giving her one of the least profitable sales territories). Defendant's conduct, as alleged—no matter how distressing Plaintiffs found it to be—only plausibly gives rise to legal action against Defendant for unlawful discrimination. Accordingly, the IHRA preempts Plaintiffs' IIED claims as alleged, and they fail as a matter of law.

      **B.    Whether Rodney Plausibly Alleges a Constructive Discharge Theory**

In Count IV, Rodney alleges that Defendant violated the ADA because it discriminated against him based upon his association with Jennifer by reducing his hours to avoid providing him and Jennifer with employer-provided health insurance

benefits. [1-1] Count IV.[1] Rodney also alleges that, in reducing his hours, Defendant constructively discharged him because he had to resign "to take another position with a lower hourly rate in order to obtain health insurance coverage for Jennifer and himself." *Id.* ¶ 123. Defendant moves for judgment on the pleadings as to Rodney's ADA claim to the extent it is based upon a theory of constructive discharge, arguing that the Complaint does not allege facts to constitute constructive discharge. [21] at 10–12.

Constructive discharge "refers to a situation 'in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer simply intolerable.'" *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)). To plead constructive discharge, a plaintiff must show that the defendant made her working conditions "so intolerable" that she became "compelled to resign." *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996).

The Seventh Circuit has set a high bar to establish constructive discharge because "employees are generally expected to remain employed while seeking redress." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Nonetheless, a plaintiff may establish constructive discharge in two ways. First, a

---

[1] The ADA prohibits employers from discriminating against an employee because of "the known disability of an individual with whom [the employee] is known to have a relationship or association." *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 947 (7th Cir. 2008) (citing 42 U.S.C. § 12112(b)(4)). The Seventh Circuit recognizes three types of employment discrimination by association, one of which is where an employer takes an adverse employment action against an employee because the employee's spouse has a disability that is costly to the employer under the employer-provided health plan. *Larimer v. Int'l Bus. Mach. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004).

10

plaintiff may present evidence of harassment or discrimination, but the alleged working conditions must be "even more egregious" than the "high standard" required to demonstrate a hostile work environment. *McPherson*, 379 F.3d at 440. Second, a plaintiff may establish that the "employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). As to the second, the Seventh Circuit has held that a person who "is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000). Courts have held that when a demotion comes with a significant loss of salary or benefits, this may qualify as constructive discharge. *See Winkfield v. Chi. Transit Auth.*, 435 F. Supp. 3d 904, 912 (N.D. Ill. 2020) (holding plaintiff sufficiently alleged constructive discharge where her employer gave her "a demotion to a position that was substantially less pay, less benefits and part time hours," which "forced her into early retirement."); *Fulmore v. Home Depot, U.S.A., Inc.*, 423 F. Supp. 2d 861, 879 (S.D. Ind. 2006) (denying summary judgment on Title VII constructive discharge claim because a "jury could find that a reasonable person, facing a significant reduction in assigned worked hours, would feel compelled to resign and find another job."). *Cf. Blanks v. SW Bell Comm'ns. Inc.*, CIV.A 399CV1722D, 2001 WL 1636359, at *7 (N.D.

11

Tex. Dec. 18, 2001) (finding that a position change with $5,200 reduction in salary did *not* suffice to establish constructive discharge).

Here, construing the alleged facts in the light most favorable to Rodney, a reasonable jury could find that Defendant knowingly and effectively forced Rodney to resign where it reduced his position "from full-time to 20 hours per week" with a $27,000 salary decrease and no health insurance benefits while also terminating his wife Jennifer, and did so knowing that, as a result, Rodney would need to quit to find a job that provided health insurance coverage for him and Jennifer. [1-1] ¶¶ 120–23. Accordingly, Rodney has alleged facts sufficient to make out a plausible constructive discharge theory for his ADA claim.

### C. Punitive Damages Under the IHRA

Finally, Defendant seeks to strike Jennifer's request for punitive damages under her IHRA claim (Count I), arguing that the IHRA does not provide for recovery of punitive damages. [21]; [25].

The Illinois Supreme Court has not ruled on whether a plaintiff may seek punitive damages against employers under the IHRA. In *Baker v. Miller*, however, it generally discussed the IHRA section regarding employer conduct and noted that the section sets out "extensive" remedies, but that a provision for punitive damages remains "noticeably absent." 636 N.E.2d 551, 557 (Ill. 1994). Similarly, in *Page v. City of Chicago*, an Illinois Appellate Court considering an action brought pursuant to the Chicago Municipal Code commented that that the IHRA, unlike the Chicago

12

Municipal Code, "expressly limits its remedies to relief identified in the Act." 701 N.E.2d 218, 228 (Ill. App. Ct. 1998),

Subsequently, courts in this District have relied on *Baker* and *Page* to find that a plaintiff may not seek punitive damages for violation of the IHRA. For example, in *Sabet v. City of North Chicago*, the court found that the plaintiff could not seek punitive damages against the City of North Chicago for alleged discrimination and retaliation in violation of the IHRA. No. 16-cv-10783, 2020 WL 832360, at *19 (N.D. Ill. Feb. 20, 2020). Similarly, in *Stratton v. Merrill Lynch Pierce Fenner & Smith, Inc.*, the court declined to consider punitive damages, finding that the case arose under a section of the IHRA where punitive damages are not available. No. 11 C 8011, 2012 WL 1533456, at *2 (N.D. Ill. April 25, 2012).

Here, Plaintiffs acknowledge that the IHRA does not explicitly provide for punitive damages for the violations alleged. [24] at 13. It argues, however, that the IHRA also does not bar such damages and, therefore, they remain available if Plaintiffs can demonstrate that the Defendant engaged in "willful and wanton misconduct." *Id.* Plaintiffs also insist that courts remain split on the issue, relying on *Flowers v. Steckenrider*, No. 14-CV-0877-NJR-PMF, 2015 WL 13833522, at *2 (S.D. Ill. Dec. 17, 2015). [24] at 13–15. In *Flowers*, a court agreed that the IHRA does not expressly provide for punitive damages but, relying on *Vincent v. Alden-Park Strathmoor, Inc.*, 948 N.E.2d 610, 614 (Ill. 2011), it reasoned that a plaintiff may still seek punitive damages under the IHRA if the plaintiff demonstrates a "willful and wanton" violation of the Act. 2015 WL 13833522, at *2. The *Vincent* decision had

13

considered the availability of punitive damages under the Illinois Nursing Home Act and held that, even though it did not explicitly provide for punitive damages, a court could still award them. 948 N.E.2d at 614.

Here, because the Illinois Supreme Court has not formally ruled on whether the IHRA permits a punitive damages remedy, this Court must predict how it would decide the issue. *Malone v. Bankhead*, 125 F.3d 535, 539 (7th Cir. 1997). Based upon the Illinois Supreme Court's commentary in *Baker* and the Illinois Appellate Court's similar commentary in *Page*, as well as the plain language of the IHRA, the Court agrees with the district courts that have held that a plaintiff cannot seek punitive damages for alleged employer discrimination in violation of the IHRA.

Although the *Flowers* Court disagreed, this Court finds *Flowers'* reliance on *Vincent* misplaced. *Vincent* dealt with the Nursing Home Care Act not the IHRA. *See Vincent*, 948 N.E.2d at 614. There, the Illinois Supreme Court noted that the Nursing Home Care Act explicitly permits plaintiffs to sue "for any other type of relief, including injunctive and declaratory relief, permitted by law" as well as "any other legal remedies." 948 N.E. 2d at 502–03 (quoting 210 ILCS 45/3-603, 604). Based upon this language and the statute's history, the *Vincent* Court held that common law punitive damages remained a viable remedy for "willful and wanton" violations of the statute. *Id* (noting this is a "settled principle of Illinois law"); *see also Sensational Four, Inc. v. Tri-Par Die and Mold Corp.*, 53 N.E.3d 325, 330 (Ill. App. Ct. 2016) (discussing *Vincent* and noting "common-law punitive damages are

14

recoverable in addition to statutory damages where the language in the statute supports such interpretation.").

In contrast, the IHRA contains no similarly expansive language. Instead, the IHRA section related to unlawful discrimination in the employment context plainly states that courts "may provide any relief or penalty *identified* in this Section" for employment-related civil rights violations and lists several pecuniary remedies such as actual damages, backpay, fringe benefits, attorneys' fees and costs, and interest. 775 ILCS 5/8A-104 (emphasis added). As the Illinois Supreme Court recognized in *Baker*, 636 N.E.2d at 557, a punitive damages remedy remains "noticeably absent" from the remedies enumerated in Section 8A-104.

The omission of any express authorization for punitive damages in Section 8A-104 takes on particular significance when compared to a different provision of the IHRA that applies to real estate transactions. *See* 775 ILCS 5/10-102. Unlike Section 8A-104, Section 10-102 expressly permits a plaintiff to recover punitive damages for unlawful discrimination. *See id.* § 10-102(C)(1). The Illinois legislature's express inclusion of a punitive damages remedy in Section 10-102(C)(1) compared to its exclusion of a punitive damages remedy in Section 8A-104 strongly indicates that it did not intend to permit plaintiffs to recover punitive damages for violations of Section 8A-104.

Overall, given the IHRA's plain language coupled with the commentary in *Baker* and *Page*, this Court follows suit with the district courts that have held that a plaintiff may not seek punitive damages for alleged violations of Section 8A-104 of

the IHRA. Accordingly, the Court grants Defendant's motion to strike the request for punitive damages under Count I.

### IV. Conclusion

For the reasons explained above, this Court grants in part and denies in part Defendant's motion for judgment on the pleadings, [20]. It dismisses Counts III and V without prejudice; and strikes the request for punitive damages under Count I.

Dated: September 27, 2022

Entered:

_____
John Robert Blakey
United States District Judge